UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| GRYPHON NETWORKS CORP.,<br><br>Plaintiff,<br><br>v.<br><br>CONTACT CENTER COMPLIANCE CORP.,<br>MICHAEL KOVATCH, and DAVID KEIM,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION<br>NO.: 10-10258<br><br>**LEAVE TO FILE GRANTED<br>OCTOBER 14, 2010** |

## <u>SECOND AMENDED COMPLAINT AND JURY DEMAND</u>

Plaintiff Gryphon Networks Corp. ("Gryphon") for its Complaint for (i) patent

infringement, misappropriation of confidential information, obtaining of trade secrets,

conversion, interference with contract, interference with advantageous business relations, unfair

competition, unfair and deceptive trade practices, declaratory judgment, and injunctive relief

against defendant Contact Center Compliance Corp. ("CCCC"), (ii) misappropriation of

confidential information, obtaining of trade secrets, conversion, interference with contract,

interference with advantageous business relations, unfair competition, and injunctive relief

against Michael Kovatch ("Kovatch"), and (iii) breach of contract, breach of implied covenant of

good faith and fair dealing, misappropriation of confidential information, taking of trade secrets,

conversion, interference with advantageous business relations, unfair competition, declaratory

judgment, and injunctive relief against David Keim ("Keim") (collectively, CCCC, Kovatch, and

Keim are hereinafter referred to as the "Defendants") alleges as follows:

## THE PARTIES

1.      Plaintiff Gryphon is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located in Norwood, Massachusetts.

2.      Upon information and belief, Defendant CCCC is a corporation organized and existing under the laws of the State of California with its principal place of business located in Santa Rosa, California.

3.      On information and belief, Kovatch maintains a residence in Santa Rosa, California.

4.      On information and belief, Keim maintains a residence in Roswell, Georgia.

## JURISDICTION AND VENUE

5.      This action arises under the patent laws of the United States, 35 U.S.C. § 1 *et seq.* This Court has jurisdiction over the subject matter of the claims asserted in this action under 28 U.S.C. §§ 1331 and 1338(a).

6.      This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 as there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

7.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400.

8.      In the Employee Confidentiality, Inventions, and Non-Competition Agreement at issue, Keim "expressly consent[ed] to and agree[ed] to subject himself . . . to the jurisdiction of the courts of Massachusetts, federal or state, for purposes of determining any and all rights or obligations under [that contract]."  Agreement ¶11.

## FACTUAL BACKGROUND

9.      Gryphon is in the business of contact governance solutions, by developing and selling systems for compliance, privacy, and preference management for phone, text, fax, email and mail marketing channels.  In particular, Gryphon develops and sells systems for compliance with state, federal, and international Do-Not-Call restrictions.

10.      Gryphon not only offers solutions for use in large call centers, but also products that permit calls to be made by individuals from wherever they may be.  Through products like its Call Adviser solution, Gryphon's customers can assure that all calls made by individuals, whether from their offices or on the road, are Do-Not-Call compliant.

11.      Gryphon is the owner of United States Patent No. 6,130,937 (the '937 patent), which was duly and legally issued by the United States Patent and Trademark Office on October 10, 2000, for an invention entitled "System and Process for Automatic Storage, Enforcement and Override of Consumer Do-Not-Call Requests." (Copy attached as *Exhibit A*).

12.      The '937 patent grants Gryphon the exclusive right to make, use, offer for sale, and/or sell systems for automatic enforcement and update of a Do-Not-Call database incorporating the inventions disclosed therein.

13.      CCCC makes and sells Do-Not-Call dial protection systems for call centers.  In addition, CCCC has begun offering solutions that provide enforcement and real-time updates to a Do-Not-Call database for individuals outside the call center, including, without limitation, its SmartBlock product.

14.      Kovatch is the Chief Executive Officer of CCCC.

15.      CCCC is a direct competitor of Gryphon, not only in the general Do-Not-Call compliance business, but with its SmartBlock product, which competes head-to-head with Gryphon's Call Adviser solution.

16.     Upon information and belief, CCCC regularly transacts business in the Commonwealth of Massachusetts and in this judicial district by, among other things, the offer for sale and sale of systems that meet the limitations set forth in the claims of the '937 Patent, including, without limitation, its SmartBlock product.

17.     Upon information and belief, CCCC's infringement of the '937 Patent has been knowingly and willfully committed.

18.     Gryphon employed Keim from on or about September 4, 2008 until on or about October 22, 2009 as its Global Account Executive.

19.     As an express condition of employing Keim, Gryphon required Keim to enter into an Employee Confidentiality, Inventions, and Non-Competition Agreement (the "Agreement") with Gryphon, which he did on or about September 4, 2008.  (Copy attached as _Exhibit B_).

20.     During his employment at Gryphon, Keim was exposed to significant financial, business, marketing, operations, and other information of a confidential and proprietary nature related to Gryphon's present and potential business.  This included without limitation (a) sales strategy and focus, (b) detailed industry and product focus, (c) expansion plans, (d) product development plans, and (e) Gryphon's customer management system, which included all names, contacts, and additional valuable history for Gryphon's customers (collectively, the "Confidential Information").  Only through his employment with Gryphon, coupled with his execution of the Agreement, was Keim allowed access to this information.

21.     Because Gryphon knew that Keim would have access to the Confidential Information, Gryphon sought to protect this valuable confidential and proprietary information through the Agreement.  Keim made a number of related acknowledgments in the Agreement, including:

(a)     the Company's Confidential Information is a valuable, special and unique asset of the Company;

(b)     access to and knowledge of the Confidential Information by Employee may be required so that Employee can perform his/her duties as an employee of the Company;

(c)     it is ***vital to the Company's legitimate business interests*** that (1) the confidentiality of the Confidential Information be preserved and (2) the Confidential Information only be used for the benefit of the Company;

(d)     disclosure of the Confidential Information to any other person or entity outside the Company or use of the Confidential Information by or on behalf of any other person or entity, unless specifically and unambiguously authorized by Employer, would result in ***irreparable harm to the Company***;

(e)     disclosure or use beyond the permitted scope of Confidential Information entrusted to the Company by its customers and contractors would ***expose the Company to substantial damages***; . . . .

Agreement, § 3.1 (emphasis added).

22.     Only individuals who had entered non-disclosure obligations similar to those contained in the Agreement were permitted to access the Confidential Information.

23.     Given the sensitive nature of this information, Keim expressly agreed:

Except as expressly directed by the Company, Employee ***shall not, during or after the term of Employee's employment by the Company, in whole or in part, disclose such Confidential Information*** to any person, firm, corporation, association or other entity for any reason or purpose whatsoever, nor shall Employee make use of any such Confidential Information for Employee's own purposes or for the benefit of any person, firm, corporation or other entity under any circumstances during or after the term of Employee's employment;

Agreement, § 3.2 (emphasis added).  Keim agreed that such a restriction would "remain in effect during the term of [his] employment by [Gryphon] and for a period of seven (7) years thereafter, but [that it would] be perpetual as to trade secrets." *Id.*

24.     Keim further agreed to return all Confidential Information at the conclusion of his employment with Gryphon.  Specifically, Keim agreed:

> All Confidential Information, including without limitation, all Derivatives and Company Developments, are and shall continue to be the exclusive property of the Company. ***Immediately upon any termination of Employee's employment*** or at any time upon the request of the Company, ***Employee shall deliver to the Company, or its designee, all of such Confidential Information and all other Company property then in Employee's actual or potential possession or control in any tangible or electronic form***. If Employee and Company agree that any specific Information or property cannot reasonably be delivered, Employee shall provide reasonable evidence that such materials have been destroyed, including but not limited to, the purging or erasing of any and all computer records and data files.

Agreement, § 3.5 (emphasis added).

25.     In addition to his daily access to Gryphon's confidential information, while at Gryphon, Keim played a key role in developing and maintaining Gryphon's close business relationships with some of Gryphon's most important customers. Keim's accounts were throughout the United States, including at least one account in 40 of the 50 states. Such relationships give Gryphon a competitive advantage over other firms who have not yet managed to establish such strong relationships.

26.     Because of the competitive sensitivity of the information provided to Keim, and his role in maintaining Gryphon's goodwill, Keim expressly acknowledged in the Agreement that he would not be able to work for a competitor of Gryphon without violating his non-disclosure obligations and causing significant and irreparable harm to Gryphon. Specifically, Keim acknowledged that:

> (i) his/her ***working for a competitor of the Company would lead to the inevitable disclosure of the Company's Confidential Information***; (ii) in the course of Employee's employment with the Company, customers and others may come to recognize and associate Employee with the Company, its products and services, and that Employee will thereby benefit from the Company's goodwill; and (iii) ***if Employee were to engage in competition with the Company, directly or indirectly, Employee would thereby usurp the Company's goodwill***.

Agreement, § 5.2 (emphasis added).

27.     In light of this inevitable and irreparable harm, Keim agreed that, for "the period commencing upon termination of [his] employment with [Gryphon], irrespective of the reason or absence of reason for such termination, and ending twelve (12) months after such termination" (the "Non-competition Period"), he would not, "directly or indirectly:

> (i) **solicit, service, accept orders from, or otherwise have business contact with** any person or entity who has, within the one-year period immediately prior to such termination of Employee's employment, been **a customer** (including, without limitation, a reseller or end user of products) of [Gryphon], if such contact could directly or indirectly divert business from or adversely affect the business of [Gryphon]; . . . [or] (iii) **work for or have an interest in a company that competes with [Gryphon], directly or indirectly, in products, market, or services anywhere in the Territory. . . .**

Agreement, § 5.3 (emphasis added).

28.     Keim also agreed that the Non-Competition Period would be "extended for so long as [he] violates the non-competition obligation set forth [in the Agreement] and for any period(s) of time required for litigation to enforce its provisions."   Agreement, Schedule A. Given that Gryphon had customers in 40 of the 50 states, the Agreement defined Territory to include all of the United States.  *Id.*

29.     Keim expressly acknowledged that "the duration of the Non-competition Period is reasonable and necessary" and that "the scope of the geographical restriction on competition with [Gryphon] in the Territory is reasonable and necessary." Agreement, § 5.6.

30.     Keim came to Gryphon's Norwood, Massachusetts headquarters to enter the Agreement and made frequent visits to Massachusetts in connection with his employment with Gryphon.  As such, the parties agreed to the following provision regarding governing law and jurisdiction:

> This Agreement shall be governed by and construed and enforced in accordance with the internal laws of the Commonwealth of Massachusetts (without reference to principles of conflicts or choice of law that would cause the application of the internal laws of any other jurisdiction).   Any dispute concerning or action to

enforce this Agreement shall be brought in Massachusetts. ***Employee expressly consents to and agrees to subject himself/herself to the jurisdiction of the courts in Massachusetts, federal or state, for purposes of determining any and all rights or obligations under this Agreement.***

Agreement, § 11 (emphasis added).

31.     Finally, Keim agreed to "inform [Gryphon] of the name and address of any employer(s) [he] may have . . . within the Non-Competition Period" and to "provide any such employer(s) with a copy of [the] Agreement."  Agreement, § 5.3.

32.     Keim's employment with Gryphon ended on or about October 22, 2009.  He was, at that time, reminded of his obligations under the Agreement.

33.     Upon information and belief, prior to the termination of Keim's employment with Gryphon, Keim transferred hundreds of proprietary and confidential Gryphon electronic files from his Gryphon-issued computer to his personal computer.

34.     In breach of his obligations under § 3.5 of the Agreement, when Keim's employment with Gryphon was terminated, Keim failed to return the confidential Gryphon documents that he had transferred to his personal computer.

35.     In or about November 2009, Keim began performing services for CCCC as its Director of Sales.  Gryphon did not receive a notice of new employment as mandated by § 5.3 of the Agreement.

36.     At or around the time of his engagement, and without Gryphon's authorization, Keim provided via electronic mail to CCCC a Gryphon document titled "Gryphon_Account List_DPK_with_email" that identifies four hundred and thirty five (435) Gryphon customers, and for each customer identifies their account contact names, telephone numbers, email addresses and the Gryphon services they receive (the "Customer Details Spreadsheet").

37.     Upon information and belief, after Keim began performing services for CCCC as its Director of Sales, Keim transmitted the Customer Details Spreadsheet via email to CCCC. Keim titled the document "Gryphon Account List Funnel with DPK highlights.xls."

38.     Upon information and belief, Kovatch and Keim collaborated on assigning the Gryphon contacts identified in the Customer Details Spreadsheet to either Keim or Ryan Thurman.  Ryan Thurman also served as a Director of Sales for CCCC.

39.     Upon information and belief, Kovatch and Keim assigned Gryphon's contacts to either Keim or Ryan Thurman with the intention of using the information contained within the Customer Details Spreadsheet to contact Gryphon's customers and take the customers away from Gryphon.

40.     Upon information and belief, the names and addresses contained within the Customer Details Spreadsheet were added to CCCC's Contact Resource Management software application.

41.     Upon information and belief, CCCC used the information contained within the Customer Details Spreadsheet to send promotional emails to the companies identified in the Customer Details Spreadsheet.

42.     Also at or around the time of his engagement with CCCC, and without Gryphon's authorization, Keim provided to CCCC a Gryphon document titled "2008 All Invoicing_DPK" that contains ten excel spreadsheets that identify detailed Gryphon accounts receivable information, including revenues by customer, by product, by month, by country, and by customer industry and industry segment (the "Private Financial Information Spreadsheet").

43.     Upon information and belief, Keim and Kovatch combined the information within the Private Financial Information Spreadsheet and Customer Details Spreadsheets to create at

least two versions of a "Leads Allocation 12_8_09.xls" spreadsheet, one titled "Leads Allocation 12_8_09(a)_DPK_edits.xls" and one titled "Leads Allocation 12_10_09 MGK.xls" (collectively, the "Leads Allocation 12_8_09.xls" and variations thereof are hereinafter referred to as the "Leads Allocation Spreadsheet").

44.     The Leads Allocation Spreadsheet takes sensitive customer information and financial information concerning Gryphon's revenues from the sale of its products and incorporates that data into CCCC's plans for contacting Gryphon's customers and taking the customers away from Gryphon.

45.     Upon information and belief, Kovatch and Keim collaborated on assigning the contacts identified within the Private Financial Information Spreadsheet to either Keim or Ryan Thurman.

46.     Upon information and belief, Kovatch and Keim assigned Gryphon's contacts to either Keim or Ryan Thurman with the intention of using the information contained within the Private Financial Information Spreadsheet to contact Gryphon's customers and take the customers away from Gryphon.

47.     Upon information and belief, Keim contacted customers listed on the Customer Details Spreadsheet, the Leads Allocation Spreadsheet, and/or the Private Financial Information with the intention of stealing the customers away from Gryphon.

48.     Much of the information contained within the Customer Details Spreadsheet, Private Financial Information Spreadsheet, and Leads Allocation Spreadsheet (individually and collectively, including all copies, transcriptions, or other reproductions of some or all of the documents or the information contained therein hereafter the "Gryphon Documents") is highly confidential and proprietary.

49.     Upon information and belief, Keim exceeded his authorization during his employment with Gryphon by accessing and downloading hundreds of confidential Gryphon files, including the Customer Details Spreadsheet and/or Private Financial Information Spreadsheet from Gryphon's computers with an intent to use the files, including the Customer Details Spreadsheet and/or Private Financial Information Spreadsheet for his own personal gain, including by sharing the Customer Details Spreadsheet and/or Private Financial Information Spreadsheet with a competitor of Gryphon.

50.     In his role as Director of Sales at CCCC, Keim actively marketed products and services that are directly competitive to those offered by Gryphon, including CCCC's SmartBlock system which is directly competitive to Gryphon's Call Adviser solution.

51.     On information and belief, CCCC, Kovatch and Keim may have used, and may still be using, the Confidential Information, including without limitation customer information, pricing information, Gryphon methods and know-how to which Keim had access as a Gryphon employee to further these activities, and information contained within the Gryphon Documents. For example, on information and belief, Keim has solicited specific internal Gryphon contacts at existing Gryphon customers, which information was likely misappropriated from Gryphon's confidential customer files.

52.     Such conduct is in direct, repeated, and willful violation of the Agreement.

53.     Keim's employment with CCCC is in violation of his non-disclosure obligation under § 3.2 of the Agreement.

54.     Keim's failure to return the confidential Gryphon documents saved on his personal computer was a breach of his obligations to Gryphon under § 3.5 of the Agreement.

55.      Keim's employment with CCCC is in violation of his non-competition obligation under § 5.3 of the Agreement.

56.      Keim's failure to inform Gryphon of the name and address of his new employer, CCCC, was a breach of his disclosure obligations to Gryphon under § 5.3 of the Agreement.

57.      On information and belief, in further breach of his disclosure obligations to any new employer under § 5.3 of the Agreement, Keim did not provide CCCC with a copy of the Agreement.

58.      Such conduct shows an intent on Keim's part to expressly disregard his obligations under the Agreement.

59.      On or about February 16, 2010, Gryphon sent Keim a letter reminding him of his obligations under the Agreement and demanding that he therefore end his employment with CCCC and thereafter honor the Agreement.  A copy of the Agreement was appended to the letter, which was also sent to Kovatch.

60.      Upon information and belief, on or about April 30, 2010, CCCC terminated its engagement with Keim.

61.      Gryphon has been and will continue to be substantially and irreparably harmed by the above-described conduct by CCCC, Kovatch, and Keim.

## COUNT ONE - INFRINGEMENT OF THE '937 PATENT
### (Against CCCC)

62.      Gryphon repeats and realleges, as if fully set forth at this point herein, the allegations contained in all the preceding paragraphs.

63.      This action arises under the United States Patent Laws, Title 35, United States Code.

64.     The '937 patent was validly issued by the United States Patent and Trademark Office and is valid and enforceable.

65.     CCCC manufactures, imports, uses, sells, and/or offers for sale products or services throughout the United States that infringe one or more claims of the '937 patent literally or under the doctrine of equivalents.  By its acts, CCCC is also inducing others to infringe the '937 patent and contributing to the infringement by others of the '937 patent.

66.     Gryphon has been irreparably harmed and monetarily damaged by CCCC's infringement of the '937 patent.  If CCCC's infringement is not permanently enjoined, Gryphon will continue to be irreparably harmed and monetarily damaged.

67.     Upon information and belief, CCCC has been and is aware of the '937 patent and its infringement has been and continues to be in total disregard of Gryphon's exclusive rights under the '937 patent.

68.     Upon information and belief, CCCC's infringement is deliberate and willful.  This is an exceptional case warranting an award of treble damages to Gryphon under 35 U.S.C. § 284 and an award of its reasonable attorneys' fees and costs for the maintenance of this action under 35 U.S.C. § 285.

## COUNT TWO - BREACH OF CONTRACT
### (Against Keim)

69.     Gryphon repeats and realleges, as if fully set forth at this point herein, the allegations contained in all the preceding paragraphs.

70.     The Agreement is a valid and enforceable contract supported by good and adequate consideration.

71.     By his actions, as set forth above, Keim has materially breached the Agreement.

72.     Gryphon is and will continue to be irreparably harmed as a direct and proximate result of Keim's actions.

## COUNT THREE - BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against Keim)

73.     Gryphon repeats and realleges, as if fully set forth at this point herein, the allegations contained in all the preceding paragraphs.

74.     The Agreement is a valid and enforceable contract supported by good and adequate consideration.

75.     Keim is bound by the implied covenant of good faith and fair dealing in the Agreement, which is an implied term of all contracts in Massachusetts as a matter of law.

76.     By his conduct, as set forth above, Keim has breached the covenant of good faith and fair dealing implied in the Agreement.

77.     As a result of Keim's breaches, Gryphon has suffered substantial and incalculable damages.

## COUNT FOUR - MISAPPROPRIATION OF CONFIDENTIAL INFORMATION
### (Against All Defendants)

78.     Gryphon repeats and realleges, as if fully set forth at this point herein, the allegations contained in all the preceding paragraphs.

79.     On information and belief, Defendants have misappropriated confidential, proprietary information in the form of at least the information contained within the Customer Details Spreadsheet, the Leads Allocation Spreadsheet and the Private Financial Information Spreadsheet, all of which contain sensitive property of Gryphon and in which Gryphon has a substantial proprietary interest.

80.     Gryphon is and will continue to be irreparably harmed as a direct and proximate result of Defendants' actions, harm which will continue and worsen absent injunctive relief.

### COUNT FIVE - TAKING OF TRADE SECRETS
### (M.G.L. c. 93, §§ 42, 42A)
### (Against Keim)

81.     Gryphon repeats and realleges, as if fully set forth at this point herein, the allegations contained in all the preceding paragraphs.

82.     As set forth above, on information and belief, Keim has unlawfully taken trade secrets, including the Customer Details Spreadsheet and the Private Financial Information Spreadsheet that are the property of Gryphon with intent to convert them to his own use, and, in fact, has used or threatened to use them as his own.

83.     As a result of the misappropriation of trade secrets by Keim, Gryphon has suffered substantial damages and irreparable injury, and any further misappropriation would cause further incalculable harm.

84.     Under M.G.L. c. 93 § 42A, Gryphon is entitled to a preliminary injunction enjoining Keim from further taking, receiving, concealing, assigning, transferring, leasing, pledging, copying, or otherwise using or disposing of Gryphon's trade secrets.

### COUNT SIX - OBTAINING OF TRADE SECRETS
### (M.G.L. c. 93, §§ 42, 42A)
### (Against CCCC and Kovatch)

85.     Gryphon repeats and realleges, as if fully set forth at this point herein, the allegations contained in all the preceding paragraphs.

86.     CCCC and Kovatch wrongfully obtained, received and otherwise misappropriated trade secrets belonging to Gryphon through Keim, and continue to possess and use those trade secrets in competition with Gryphon.

87.     As a result of the misappropriation of trade secrets by CCCC and Kovatch, Gryphon will suffer substantial, incalculable, and irreparable harm.

## COUNT SEVEN - CONVERSION
### (Against All Defendants)

88.     Gryphon repeats and realleges, as if fully set forth at this point herein, the allegations contained in all the preceding paragraphs.

89.     By their actions as set forth above, Defendants intentionally and without right exercised and continue to exercise dominion and control over valuable property of Gryphon's, including the Customer Details Spreadsheet, the Leads Allocation Spreadsheet and the Private Financial Information Spreadsheet and all other Gryphon proprietary information in their possession, custody or control and in a manner inconsistent with Gryphon's rights.

90.     This conduct by Defendants has caused and/or will cause Gryphon incalculable, irreparable harm and substantial damages, which will continue and worsen absent injunctive relief.

## COUNT EIGHT - INTERFERENCE WITH CONTRACT
### (Against CCCC and Kovatch)

91.     Gryphon repeats and realleges, as if fully set forth at this point herein, the allegations contained in all the preceding paragraphs.

92.     By its conduct, CCCC and Kovatch knowingly and intentionally interfered with Gryphon's contract with Keim, with improper purpose and by improper means, causing Keim to breach his contractual and good faith obligations to Gryphon.

93.     CCCC's and Kovatch's conduct was intentional and malicious, and caused direct and irreparable harm to Gryphon.

## COUNT NINE - INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONS
### (Against All Defendants)

94.     Gryphon repeats and realleges, as if fully set forth at this point herein, the allegations contained in all the preceding paragraphs.

95.     Gryphon seeks to sell its products to its current and potential customers, including those customers listed in the Customer Details Spreadsheet.  The prospective sale of Gryphon's products to its customers constitutes a prospective business relationship from which Gryphon could reasonably expect to receive a financial benefit.

96.     Defendants were aware of Gryphon's prospective business relationships.

97.     Despite this awareness, upon information and belief, Defendants have intentionally and improperly interfered with these relationships by soliciting Gryphon's customers and potential customers to sever relationships with Gryphon and instead form a business relationship with CCCC.

98.     Defendants, through the acts described above, intended to harm Gryphon's existing and prospective business relations.

99.     Defendants' interference with Gryphon's existing and prospective business relationships was improper in motive and means.

100.    By reason of the foregoing, the improper actions of Defendants have harmed and threaten to cause future harm to Gryphon and Gryphon is entitled to damages in an amount to be proven at trial and injunctive relief.

## COUNT TEN - UNFAIR COMPETITION
### (Against All Defendants)

101.    Gryphon repeats and realleges, as if fully set forth at this point herein, the allegations contained in all the preceding paragraphs.

102.     Defendants' acts and conduct as set forth herein constitute unfair competition, willful, unfair and deceptive acts or practices within the Commonwealth of Massachusetts and in violation of Massachusetts common law.

103.     Both Gryphon and Defendants are engaged in trade and commerce in the Commonwealth of Massachusetts.

104.     Defendants' wrongful activities have intended to cause, have caused, and unless enjoined by this Court will continue to cause, irreparable injury and other damage to Gryphon's business, reputation, and goodwill.

105.     Defendants' conduct as described above has been willful, wanton, reckless, and in violation of the rights of Gryphon.

106.     As a result of Defendants' acts alleged above, Gryphon has suffered, and continues to suffer, injury.

107.     As a result of Defendants' acts alleged above, Gryphon is entitled to damages in an amount to be proven at trial.

## COUNT ELEVEN - UNFAIR AND DECEPTIVE TRADE PRACTICES
### (M.G.L. c. 93A, § 11)
### (Against CCCC)

108.     Gryphon repeats and realleges, as if fully set forth at this point herein, the allegations contained in all the preceding paragraphs.

109.     CCCC is a business engaged in trade or commerce in the Commonwealth of Massachusetts.

110.     CCCC engaged in unfair and deceptive trade practices by inducing Keim to pass to CCCC confidential, proprietary information and trade secrets belonging to Gryphon.

111.     CCCC used Gryphon's confidential and proprietary information to solicit Gryphon's Massachusetts-based customers.

112.    The unfair and deceptive trade practices of CCCC occurred primarily and substantially within the Commonwealth of Massachusetts.

113.    CCCC intentionally and willfully violated G. L. c. 93A, § 11.

114.    As a result of CCCC's unfair and deceptive trade practices, Gryphon has suffered loss of money and other substantial and irreparable harm.

## COUNT TWELVE - COMPUTER FRAUD AND ABUSE ACT
### (18 U.S.C. §1030)
### (Against Keim)

115.    Gryphon repeats and realleges, as if fully set forth at this point herein, the allegations contained in all the preceding paragraphs.

116.    In accessing Gryphon's computers for the purpose of obtaining and transferring Gryphon's files, Keim intentionally accessed a computer used for interstate commerce or communication without authorization, or in the alternative exceeded his authorized access rights.

117.    In accessing Gryphon's computers as described above, Keim knowingly and with intent to defraud obtained one or more things of value in the form of the Customer Details Spreadsheet and the Private Financial Information Spreadsheet.

118.    The computer system or systems that Keim accessed as described above constitute a "protected computer" within the meaning of 18 U.S.C. §1030(e)(2).

119.    As a result of Keim's unlawful access, Gryphon has suffered irreparable harm and substantial damages, which will continue and worsen absent injunctive relief.

## COUNT THIRTEEN - DECLARATORY JUDGMENT
### (Against CCCC and Keim)

120.    Gryphon repeats and realleges, as if fully set forth at this point herein, the allegations contained in all the preceding paragraphs.

121.    Pursuant to Mass. G.L. ch. 231A, Gryphon is entitled to immediate declaratory relief that the Agreement is a valid and binding contract between Keim and Gryphon in all respects.

122.    An actual controversy, as demonstrated by Keim's violation of the express terms of the Agreement, has arisen and now exists between Gryphon and Keim concerning their respective rights and obligations with respect to the Agreement.

123.    Gryphon requires a judicial determination of the rights and obligations of Gryphon and Keim with respect to the Agreement.

124.    A declaration that Keim is not permitted to compete directly against Gryphon is necessary and appropriate at this time and will terminate the controversy.

125.    Gryphon is also entitled to immediate declaratory relief that Keim's conduct and his employment by CCCC breaches the Agreement.

## COUNT FOURTEEN - INJUNCTIVE RELIEF
### (Against All Defendants)

126.    Gryphon repeats and realleges, as if fully set forth at this point herein, the allegations contained in all the preceding paragraphs.

127.    As set forth above, Keim has willfully and materially breached his obligations in the Agreement, and has likely also misappropriated confidential information and trade secrets from Gryphon.  Clearly, further breach of the Agreement is imminent and indeed ongoing.

128.    As set forth above, CCCC and Kovatch have induced Keim to breach his obligations under the Agreement and appears to intend to continue inducing Keim to do so.

129.    Plaintiff has no adequate remedy at law for Keim's breaches of the Agreement and Defendants' inevitable use of Gryphon's Confidential Information.

130.    The balance of equities favors entry of an injunction.

## PRAYER FOR RELIEF

**WHEREFORE**, Gryphon prays that this Court enter judgment as follows:

A.   Judgment that CCCC and those in privity therewith have infringed U.S. Patent No. 6,130,937;

B.   Judgment that CCCC's infringement of U.S. Patent No. 6,130,937 was willful;

C.   Award Gryphon compensatory damages and prejudgment interest thereof for CCCC's acts of infringement of U.S. Patent No. 6,130,937;

D.   Award treble damages for willful infringement of U.S. Patent No. 6,130,937;

E.   Permanently enjoin CCCC from further infringement of U.S. Patent No. 6,130,937;

F.   Enjoin Keim, his agents, servants, employees and all persons acting for or on his behalf or in concert with him from, directly or indirectly:

   (1)   within the United States, engaging in or participating in providing contact governance solutions, by developing and selling systems for compliance, privacy, and preference management for phone, text, fax, email and mail marketing until February 24, 2011 or one year after Keim ceases breaching the Agreement, whichever is later;

   (2)   serving as an officer, employee, agent, contractor, consultant, or any other position for CCCC until February 24, 2011 or one year after Keim ceases breaching the Agreement, whichever is later;

   (3)   soliciting, interfering with or attempting to entice away from Gryphon any person who is an employee of Gryphon until February 24, 2011 or one year after Keim ceases breaching the Agreement, whichever is later;

   (4)   interfering with or attempting to entice away from Gryphon any person, firm or corporation which is or was, at any time between September 4, 2008 and October 22, 2009, a customer of Gryphon, until February 24, 2011 or one year after Keim ceases breaching the Agreement, whichever is later;

   (5)   using or disclosing any Gryphon information not already lawfully available to the public concerning any Gryphon clients, prospective clients, candidates, prospective candidates, or other information which

Gryphon treats as confidential and/or proprietary until October 2016, including without limitation the information contained within the Customer Details Spreadsheet, the Leads Allocation Spreadsheet and/or Private Financial Information Spreadsheet; and

(6) altering, destroying, discarding or otherwise removing from the jurisdiction of this Court all property of Gryphon and all documents and things relating to Keim's conduct concerning current and former Gryphon customers.

G. Enjoin CCCC, its agents, servants, employees and all persons acting for or on its behalf or in concert with it from, directly or indirectly, misappropriating, using, disclosing or benefiting in any manner from Gryphon's confidential or proprietary information, including without limitation the information contained within the Customer Details Spreadsheet, the Leads Allocation Spreadsheet and/or Private Financial Information Spreadsheet;

H. Enjoin Kovatch, his agents, servants, employees and all persons acting for or on his behalf or in concert with him from, directly or indirectly, misappropriating, using, disclosing or benefiting in any manner from Gryphon's confidential or proprietary information, including without limitation the information contained within the Customer Details Spreadsheet, the Leads Allocation Spreadsheet and/or Private Financial Information Spreadsheet

I. Enjoin CCCC, its agents, servants, employees and all persons acting for or on its behalf or in concert with it from, directly or indirectly employing Keim until February 24, 2011 or one year after Keim ceases breaching the Agreement, whichever is later;

J. Judgment against Defendants for all damages incident to the conduct described herein, including double and treble damages and attorney's fees pursuant to G. L. c. 93, § 42 and G. L. c. 93A, § 11;

K.      Judgment that this is an exceptional case under 35 U.S.C. § 285 warranting an award of Gryphon's attorneys' fees;

L.      Award Gryphon its actual costs, expenses, and reasonable attorneys' fees, including all related costs and expenses, incurred by Gryphon in connection with this action; and

M.      Award Gryphon such other relief may be deemed just and equitable.

## **JURY DEMAND**

Gryphon demands a trial by jury on all matters and issues triable by a jury.

**GRYPHON NETWORKS CORP.,**

By its attorneys,

/s/ Joshua M. Dalton
Joshua M. Dalton (BBO #636402)
Lawrence T. Stanley, Jr. (BBO #657381)
Julie Silva Palmer (BBO #676788)
**BINGHAM MCCUTCHEN LLP**
One Federal Street
Boston, MA  02110
617.951.8000

Dated: October 14, 2010

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified in the Notice of Electronic Filing and paper or electronic copies will be delivered to those indicated as non-registered participants on October 14, 2010.

                      /s/ Joshua M. Dalton
                      Joshua M. Dalton